**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No:  1:26-cv-3564

---

**EMPLOYERS MUTUAL CASUALTY COMPANY , an Iowa corporation,**

**Plaintiff,**

**v.**

**HIGH DESERT IRRIGATION, LLC, a Colorado limited liability company,
LARRY HERSH, CHAD WASHBURN and JENNIFER WASHBURN**

**Defendants**

---

### COMPLAINT FOR DECLARATORY JUDGMENT

---

Plaintiff, Employers Mutual Casualty Company ("hereinafter referred to as "EMC"), by and through its attorneys, Giometti & Mereness, P.C., files this Complaint for Declaratory Judgment pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, requesting a declaration of the parties' rights and obligations with respect to EMC's commercial general liability policy issued to its named insured, High Desert Irrigation, LLC (the "Policy").   In support, EMC states the following:

### I.  THE PARTIES AND UNDERLYING ACTION

1.    Plaintiff EMC is a corporation formed under Iowa law, with its principal corporate headquarters located in Des Moines, Iowa.  EMC is a citizen of the state of Iowa.

1

2.      Defendant High Desert Irrigation, LLC  ("HDI"), is a Colorado-formed limited liability company, with its principal office located at 206 Hill St, Kersey, Colorado 80644. HDI may be served through it registered agent, Destiny Leann Gomez, whose registered address is 206 Hill St, Kersey, Colorado 80644.

3.      Upon information and belief, all members of HDI are domiciled in Colorado and are citizens of the state of Colorado.

4.      Defendant Larry Hersh (hereinafter referred to as "Mr. Hersh") is a member of HDI, and may be served at HDI's primary place of business located at 206 Hill St, Kersey, Colorado 80644 or his principal residence address located at 16591 County Road 88, Pierce, Colorado 80650.

5.      Upon information and belief, Mr. Hersh is domiciled in Colorado and is a citizen of the state of Colorado.

6.      Defendants Chad Washburn and Jennifer Washburn (hereinafter, the "Homeowners") are married and live together at their primary residence located at 2182 Vista Shores Court in Fort Collins, Colorado. (hereinafter, the "Property").

7.      Upon information and belief, the Homeowners are each domiciled in Colorado and are citizens of Colorado.

8.      On June 12, 2026, the Homeowners filed their Complaint against HDI and Mr. Hersh (referred to herein as the "Complaint") in Larimer County District Court, Case Number 2026CV30564 (referred to herein as "the Underlying Action").

9.      A true and accurate copy of the Complaint filed in the Underlying Action on June 12, 2026, is attached hereto as **Exhibit 1**.

2

10.    In the Complaint, the Homeowners generally alleged they hired HDI to install a well on their Property. HDI was allegedly hired based upon representations, assurances and promises from Mr. Hersh that HDI would be able to access groundwater for the Property.  In reliance upon the representations, Homeowners continued with the closing of their purchase of the Property, and hired HDI to drill a well and install a cistern. Based upon continued representations that groundwater would be accessed, Homeowners paid HDI to construct the well, and the Homeowners continued building their home on the Property.  The water from the well turned out to be very hard, leaving a residue and had low flow.  Homeowners further discovered the required well report from HDI submitted to the State of Colorado had misleading information. HDI paid a fine, and offered to remediate the well at its own cost and represented the bottom of the well would have better water quality and volume. In reliance, the Homeowners permitted HDI's continued well remediation work.  The water quality and volume did not improve. Homeowners sued HDI and Mr. Hersh for the following three claims: negligence; negligent misrepresentation, and; fraudulent representation.  Homeowners alleged damages for repair and remediation costs for the well work, costs incurred to secure an alternative water source, loss of use of the Property, diminution in value of the Property, lost "views" by the eyesore created by presence of the water well equipment/cistern and soil spoils, and they sought recovery of the Property's purchase price and home's construction costs, among other damages.

11.    This Declaratory Judgment action seeks a declaration of rights, including whether a duty to defend was triggered based upon the allegations in the Underlying

3

Action' Complaint, and whether indemnity would be owed under the Policy for the damages alleged.  EMC further pursues a claim for recoupment of EMC's legal fees and defense costs it incurred for defending HDI and Mr. Hersh in the Underlying Action under a reservation of rights.

## II.  THE POLICY

12.    EMC issued the Policy, policy number 6D59949-25 to its Named Insured, HDI, containing a Policy term of October 10, 2024 to October 10, 2025.

13.    A certified and accurate copy of the Policy is attached hereto as **Exhibit 2**.

14.    The Policy was renewed for another Policy term of October 10, 2025 to October 10, 2026 (the "Renewal Policy").

15.    A certified and accurate copy of the Renewal Policy is attached hereto as **Exhibit 3**.

16.    The Policy and Renewal Policy contain the same policy terms and endorsements, and excepting their respective policy terms and premiums, are in all respects, the same. Collectively, they will be referred to as the "Policies."

17.    On or about July 1, 2026, EMC issued two reservation of rights ("ROR") letters, through EMC's counsel, each to HDI and Mr. Hersh, indicating that EMC would be defending them in the Underlying Action under a reservation of rights.

18.    True and accurate copies of these two ROR letters issued on July 1, 2026, are attached hereto as **Exhibit 4**.

19.    EMC has already incurred attorney fees and defense costs in defending HDI and Mr. Hersh in the Underlying Action.

4

20.     Since the inception of the Underlying Action, and continuing to the present, an actual and justiciable controversy has existed between EMC, on the one hand, and HDI and Mr. Hersh on the other hand, as to whether EMC had or has any duty to defend or indemnify HDI and Mr. Hersh with regard to the claims asserted against them in the Underlying Action.  The Homeowners are also persons who are or who may be affected a judicial determination as to whether any insurance coverage exists for HDI and Mr. Hersh under the Policies.

### III.  JURISDICTIONAL ALLEGATIONS

21.     Pursuant to *Constitution Associates v. New Hampshire Ins. Co.*, 930 P.2d 556 (Colo. 1996), as well as other Colorado case authority, EMC seeks a judicial declaration that it owes no duty to defend or indemnify HDI and Mr. Hersh with respect to any of the claims, allegations, and damages asserted against them in the Underlying Action, which will be binding upon HDI and Mr. Hersh, and upon the Homeowners.  In the event it is determined that no duty to defend was owed to HDI and Mr. Hersh, EMC seeks recoupment of the reasonable attorney fees and defense costs EMC incurred in providing a defense to HDI and Mr. Hersh in the Underlying Action.

22.     Based upon the terms and language of the Policy, and the allegations contained in the Underlying Action, an actual controversy has arisen between EMC and HDI and Mr. Hersh as to their respective rights and obligations under the Policy with respect to the claims asserted in the Underlying Action.

23.     EMC is presently defending HDI and Mr. Hersh in the Underlying Action subject to a full and complete reservation of rights.

24.     EMC fully reincorporates its prior allegations set forth in paragraphs 1-10 herein, showing EMC is a citizen of the State of Iowa and that all the named Defendants herein are citizens of the State of Colorado.

25.     As shown by the pleadings and the Civil Cover Sheet in the Underlying Action, the Homeowners are seeking monetary judgment against HDI and Mr. Hersh in excess of $100,000.00.

26.     A true and accurate copy of the Civil Cover Sheet filed in the Underlying Action is attached hereto as **Exhibit 5**.

27.     Therefore, this Court has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between EMC and all the Defendants and because, as shown and alleged herein, the amount in controversy exceeds $75,000.

28.     All Defendants are necessary and proper parties in this action because their interests will or may be affected by the outcome of this action.

29.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b) because the Defendants are citizens of Colorado, and the events and circumstances giving rise to any claims for benefits under the Policy occurred in this District.  Venue in this District is also appropriate because this action addresses an insurance dispute involving a contract issued in Colorado regarding alleged damages that occurred in Colorado.

## IV.  FACTUAL ALLEGATIONS- THE POLICIES

30.    The Policies issued to HDI contains Commercial General Liability Coverage Form (using ISO form CG 00 01 0413).   This coverage form contains the following pertinent policy provisions:

> Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.   The words "we", "us" and "our" refer to the company providing this coverage.
>
> The word "insured" means any person or organization qualifying as such under Paragraph **II**. Who Is An Insured. . . .

*See* **Exhibits 2** and **3**, at p. 13.

31.    This Commercial General Liability Coverage Form, starting at **SECTION I – COVERAGES**, also provides the following grant of coverage:

**COVERAGE A- BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.    Insuring Agreement**

**a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", or "property damage" to which this insurance does not apply.   We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

**b.**    This insurance applies to "bodily injury" or "property damage" only if:

**(1)**    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

7

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1** of Section **II.** Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part….

*See* **Exhibit 2** at p. 13 of 90 and **Exhibit 3** at p.13 of 89.

32.    This Commercial General Liability Form, under **COVERAGE A**, contains the following exclusions:

**2.**    Exclusions

This insurance does not apply to:

**a.    Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. . . .

(*Via* the Policies' Elite Extension Endorsement (Form #CG 75 78 (2/19), this exclusion is amended to state, "'bodily injury' or 'property damage' expected or intended from the standpoint of an insured…." See, **Exhibit 2** at p. 47 of 90 and **Exhibit** 3 at p. 51 of 89)

**b.    Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or …

**f.    Pollution**

8

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

    **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

    …

    **(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

    **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

…

**j.**    **Damage to Property**

    "Property damage" to:

    **(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

    **(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

    ….

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

See, **Exhibit 2** at pp. 14-17 of 90, and **Exhibit 3** at pp. 14-17 of 89.

33.    This Commercial General Liability Coverage Form, at **SECTION I – COVERAGES**, also provides the following grant of coverage under **Coverage B**, as follows:

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply

…

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

See, **Exhibit 2** at p. 18 of 90, and **Exhibit 3** at p.18 of 89.

34. This Commercial General Liability Form, under **COVERAGE B**, contains the following exclusions:

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

11

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or….

See, **Exhibit 2** at pp. 18-19 of 90, and **Exhibit 3** at pp. 18-19 of 89.

35.    The Commercial General Liability Form contained the following **Definitions**, which applied to both Coverage A and Coverage B, as follows:

**SECTION V – DEFINITIONS**

1.    "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a.  Notices that are published include material placed on the internet or on similar electronic means of communication; and

   b.  Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

3.    "Bodily Injury" means bodily injury, sickness, or disease sustained by a person,…..

> (*Via* the Policies' Elite Extension Endorsement (Form #CG 75 78 (2/19), this definition is amended, as follows, "'bodily injury' means bodily injury, sickness, or disease, sustained by a person, including mental anguish or death resulting from bodily injury, sickness or death." See, **Exhibit** 2 at p. 52 of 90, and **Exhibit** 3 at p. 56 of 89).

8.    "Impaired property" means tangible property, other than "your product" or "your  work", that cannot be used or is less useful because:

   a.  It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b.  You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

13.    "Occurrence" means an accident, including continuous or repeated exposure to  substantially the same general harmful conditions.

14.    "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
…
   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
   ….

16.    "Products-completed operations hazard":

   a.    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your  work"  except:

      **(1)** Products that are still in your physical possession; or

      **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

         a. When all of the work called for in your contract has been completed.

         b. When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

         c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

      Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

13

b. Does not include "bodily injury" or "property damage" arising out of:…

    3. Productions or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

18. "Suit" means civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

    …

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

21. "Your product"

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    a. You;

    b. Others trading under your name; or

    c. A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connections with such goods or products.

**b.** Includes:

14

> **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and
>
> **(2)** The providing of or failure to provide warnings or instructions.

22.    "Your work"

>  **a.** Means:
>
>  **(1)** Work or operations performed by you or on your behalf; and
>
>  **(2)** Materials, parts or equipment furnished in connections with such work or operations.
>
>  **b.** Includes:
>
>  **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
>
>  **(2)** The providing of or failure to provide warnings or instructions.

<u>See</u>, **Exhibit 2** at pp. 25-28 of 90, and **Exhibit 3** at pp. 25-28 of 89.

36.    The Policies contained a section to define an "insured" under the Policies, as follows:

> **SECTION II – WHO IS AN INSURED**
>
> **1.** If you are designated in the Declarations as:
>
> **c.** A limited liability company, you are an insured.  Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

<u>See</u>, **Exhibit 2** at p. 21 of 90, and **Exhibit 3** at p. 21 of 89.

15

37.    The Policies also included a Commercial General Liability Policy Endorsement Form CG 22 43 (04/13) Exclusion – Engineers, Architects or Surveyors Professional Liability, as set forth below:

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A –        Bodily Injury And Property Damage Liability** and **Paragraph 2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

**1.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
**2.** Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other  wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or any engineer, architect or  surveyor  who  is  either  employed  by  you  or performing work on your behalf in such   capacity.
40

See, **Exhibit 2** at p.40 of 90,  and **Exhibit 3** at p. 39 of 89.

16

## V.  FACTUAL ALLEGATIONS- THE COMPLAINT IN THE UNDERLYING ACTION

38.     The Complaint (**Exhibit 1**) in the Underlying Action contains the following relevant allegations, which may be summarized as follows:

5. At all relevant times, Mr. Hersh is and was an employee of HDI.

11. Homeowners contacted HDI "to assess whether groundwater would be accessible at the Property," which was under contract for purchase and with due diligence being performed for the purchase.

12.  Assuming water would be accessible, Homeowners planned to close on the sale and construct their home on the Property.

13.  HDI sent Mr. Hersh to visit the Property, where he "explicitly and assuredly promised" the Homeowners would be able to access groundwater at the Property.

14.  HDI's website described Mr. Hersh as having significant drilling experience.

15.  In reliance upon Mr. Hersh's promises and experience, Homeowners closed on the Property in May 2024, commenced construction of the house, and hired HDI to drill a well and install a 1,700 gallon cistern.

16.  The Property was attractive to Homebuyers because of location and beautiful vistas, and because of accessibility to groundwater (because it would require more expense and time to access water with external sources).

17.  Mr. Hersh began drilling in July 2024, and reported everything was fine, and in reliance upon his representations, Homeowners paid HDI to "construct the well" which continued into the fall of 2024.

18.  In early 2025, the water was very hard and was leaving a white residue on everything, and needed treating, but no contractor was willing to treat the water.

19.  Inquiring of other groundwater experts, Homeowners learned it was widely known water is not accessible at the Property because of a shallow shale formation, known to not produce serviceable water.

20.  HDI and Mr. Hersh's conduct was reported to the State of Colorado's Chief Well   Inspector, who inspected the well issued a letter that verified the casing and

17

grouting information on the yield report did not appear capable to isolate the Type III aquifer materials from Type II aquifer materials.

22. The inspector's letter reported that, "Mr. Hersh's conduct violated Colorado water well construction rules" by not adequately isolating the two types of aquifers, but also, "he then attempted to hide his error and mislead," [Homeowners] by including inaccurate information on his Well Construction and Yield Report.

23.  Mr. Hersh informed and insisted to the Homeowners that the bottom of the well would     have greater quality and greater flow water; as a result, Homeowners permitted Mr. Hersh and HDI to perform corrections to the well that were required by the State's inspector.  Mr. Hersh assured to the Homeowners they would still have water.

24.   Because the well corrections would be performed at HDI's/Mr. Hersh's expense and based upon Mr. Hersh's promises and his experience, the work occurred, but it resulted in  vastly diminished water flow and the water quality was still very poor.

25.  Mr. Hersh signed a stipulated agreement with the State and agreed to pay a fine, make repairs, and accept the State's allegations that: (a) Mr. Hersh violated Colorado regulations by not keeping the aquifers separated, and (b) Mr. Hersh violated regulations by providing   inaccurate information in the well report.

26.  Mr. Hersh and HDI's conduct caused significant damage to the Homeowners. If Mr.  Hersh had been honest in 2024 and advised water was not available *via* well (as was  common knowledge to others in the industry), the Homeowners likely would not have closed on the $580,000 Property and spent an additional $770,000 constructing their home on the Property.

27.  Mr. Hersh should have been aware of the lack of accessible groundwater, and had he performed the work properly and not provided inaccurate information to the Homeowners before they commenced construction, he certainly would have known that water was not accessible and the Homeowners could have avoided spending $770,000 to construct their home and other related expenses.

28.  The current well on the Property is dry and of no use. The cistern will not be needed once a long-term alternative solution for water is determined, for which they continue to incur significant engineering fees.

29.  Mr. Hersh and HDI's workmanship to drill the well directly resulted in a blue sludge being, "deposited on the ground around the well site in July 2024, damaging the Property."    The well, cistern and blue sludge all remain present with 1-1.5 feet of the well equipment and cistern protruding from the ground.  This

creates an eyesore and impairment of the wonderful views, and creates, "significant loss of use of the Property for its intended purpose,        as        the [Homeowners]' ability to landscape and recreate on their own Property is extremely difficult and a significant safety hazard to their family."

30. "Due to HDI and Mr. Hersh's conduct and the resultant property damage on their surrounding land," the Homeowners "have not been able to use the portion of their Property where the sludge pile, well, and cistern remain." The well and cistern and associated piping are underground obstructions that will make underground utility work planned in the area, difficult and hazardous. Homeowners want to landscape this area as soon as possible, but those items are in the way and need removal, "thus diminishing the Homeowners' ability to use that portion of their property."

31. The views from the back patio are diminished by the tops of the well and cistern protruding from the ground. Homeowners' inability to enjoy their views or landscape their Property has greatly impaired the ability to use their Property for its intended purpose, including their ability to take long showers without having to stop to obtain more water.



32. Photos show, blue sludge is 20' long, 10' wide, 2' high at highest point, and show, "what an eyesore this blue sludge is from up close and afar."

33. The cistern installed by HDI remains on the Property, is not needed long term, and useless once they address their long-term water solution. The cistern protrudes from the ground, "and its installation …created numerous divots … and equipment sticking out of it" that are not only an eyesore, "but has damaged the surrounding property, and created a significant trip hazard and safety risk," making it impossible "to use that part of their Property."

34. The well is not functional, is an eyesore, and a significant trip and safety hazard that prevents the Homeowners from being able to recreate or landscape on their Property. The well will have to be removed or abandoned in the future.

35. The sludge waste pile, and top of the well and cistern are clearly visible, are hazards, and Homeowners are unable to landscape. They are eyesores and deprived a phenomenal view. A realtor advised Homeowners "that the impairment to their Property greatly diminishes its market value."   The lack of accessible water also has significant impact to the Property's market value.

36. Homeowners have been advised it will cost at least $70,000 "to perform necessary repair work caused by HDI and Mr. Hersh, including cost to remove, dispose and perform reclamation of the blue sludge pile, well and cistern, and costs to "perform interior  plumbing and electrical work associated with the well and cistern."  This includes cost to remove pump controllers, pressure tank, and electrical wiring and breakers that remain in the house and take up space  which is needed for planned utility and water connections.

37. In addition to the "significant property damage already existing on the Property due to HDI and Mr. Hersh's conduct," the Homeowners have been advised "the necessary repair work itself will cause additional damage."

38. This damage includes their being advised the removal work of the blue sludge, "will cause damage to the Property."  The removal of the blue sludge will leave an area needing regrading to match the original slopes and tilled to receive new seed for grass establishment, which in the interim will prevent Homeowners from use of that portion of the Property.

39. The damage includes their being advised the well head and drill piping cannot be removed and must be capped, with a concrete cap. The capping process will inevitably cause some damage to the Property, including from construction equipment, and the associated backfill and compaction work with additional landscaping needed before Property has conditions appropriate for grass growth.

40. The damage includes work to remove the cistern tank and power and water lines to the tank require excavation of the surrounding property, which will disturb the land. The excavated area will need to be filled, compacted, and once brought to grade, soils tilled and seeded for grass establishment.

41. In addition, the Homeowners sustained at least $275,000 in added economic damages from their conduct.  Before drilling began, Mr. Hersh promised that if unable to locate water, the Homeowners would only pay HDI to dig a dry well ($3,000-$4,000).  In reliance on Mr. Hersh's misrepresentation that he located

20

water, Homeowners paid $51,000+ to construct a well, thus paying $47-$48,000 more than necessary.

42. Homeowners have now moved onto the Property and need to find an alternative water source.

43.  HDI constructed a 1,700 gallon cistern, which is insufficient to maintain a household, install landscaping, and provide water for family of four, dogs, and three horses, a garden and acquire livestock.  Currently, Homeowners drive to Fort Collins 3-4x per week and obtain 300 gallons each time, and dump into the cistern.  Fuel and water costs exceed $5,000 incurred to date.

44.  Fort Collins trips are insufficient to meet family needs and take away time from work, causing lost earnings.

45.  To help mitigate their damages, Homeowners were forced to buy a 625 gallon water  tank ($467.49), a trailer ($3,999,99), and truck with greater towing capacity ($14,449 in    charges).

46.  Homeowners incurred $6,200 in engineering costs to explore long term water solutions, and they expect to incur hundreds of thousands of dollars more in design, materials and construction.

47.  The negligent workmanship and misrepresentations caused resultant property damage and caused a financial burden by continuing to expended substantial funds to address and repair the defects and damages to the Property. They will incur attorney fees, costs, lost wages, annoyance, discomfort, inconvenience, pain and suffering and loss of use of enjoyment of their Property.

48.  Defendants breached their obligations by failing to provide the construction services and other duties in accord with the standard of care.

**FIRST CLAIM FOR RELIEF**
**(Negligence- All Defendants)**

49.  The preceding allegations are incorporated.

50-53. HDI and Mr. Hersh owed duties of care for workmanlike manner and within industry standards, practices, codes, and guidelines.  Defendants were required to exercise reasonable care skill and diligence when performing their drilling and related services.  They failed to adhere to the accepted standards in performing their services at the Property, and their failure was a direct and proximate cause of the Homeowners' damages and losses, which are accruing.

21

54.  The breaches have caused Homeowners to suffer resultant property damage, economic and non-economic damages, which include: disposing and removing blue sludge pile, well and cistern; "costs to perform interior repair work associated with well and cistern"; "costs to repair other real property damage throughout the Property"; costs to design and implement alternative water access solution; diminution of market value of Property,   damages for noneconomic damages and lost time from work; and loss of use and enjoyment     of the Property.

## SECOND CLAIM FOR RELIEF
### (Negligent Misrepresentation- All Defendants)

56.  Reincorporated the preceding allegations.

57.  While in his course and scope of employment with HDI, Mr. Hersh explicitly promised he would be able to access groundwater.  When attempting to drill, he failed to adequately isolate between the two aquifer materials, and then attempted to hide his error and mislead all parties by placing inaccurate information in the Well Construction and Yield Estimate Report.

58.   In spring 2025, and to induce the Homeowners to allow him to make corrections, Mr. Hersh assured water at the bottom of the well would be better quality and greater flow, and that they would still have water.

59. Homeowners reasonably relied on the misrepresentations of accessibility of groundwater in deciding to purchase the Property for $580,000 and spend another $770,000 to construct their home.

60.  Homeowners suffered damages [listed same damages as in para. 54].

## THIRD CLAIM FOR RELIEF
### (Fraudulent Misrepresentation- All Defendants)

62.  Reincorporated the preceding allegations.

63.  While within course and scope of employment with HDI, falsely represented [listed same allegations as in para. 57].

64.  [Same allegation as in para. 58].

65.   Mr. Hersh made the representations knowing they were false and/or was aware the Homeowners did not know whether the representations were true or false.

66. Mr. Hersh made the representations with the intention Homeowners would rely upon them by hiring HDI to perform expensive services on the Property, including drilling a well, that Homeowners would purchase the Property, which were actions the Homeowners would not have taken had Mr. Hersh and HDI not fraudulently misrepresented material facts.

67. Homeowners reasonably and justifiably relied upon the representations by hiring HDI to perform expensive services on the Property, including drilling a well, and by purchasing the Property and constructing the house (totaling $1.35 million).

68. Homeowners sustained damages as a result of this reliance, [listed same damages as in para. 54].

39. The Complaint in the Underlying Action asserts facts that the Homeowners were induced to contract with HDI based upon Mr. Hersh's advertised experience and his representations that accessible water could be obtained at the Property, that the subject of their contract (to dig/install a well/cistern) did not meet the quality or performance expectations that were represented, and that misrepresentations were made in the well and yield report HDI issued to the State of Colorado engineer. Plaintiff's Complaint at paragraph 1 similarly summarized the transaction in that manner. See, **Exhibit 1** at para. 1. These are not the type of accidental occurrences that trigger coverage; rather this was an inducement and a failure to deliver what was expected under the parties' contract, which are the types of conduct and economic damages that are not covered and are excluded as business risks under commercial liability policies.

40. The factual allegations in the Complaint do not allege "property damage" or "bodily injury" caused by an "occurrence" (*i.e.*, an accident). Even in the event the alleged damages are construed as having been unforeseeable damage to other non-defective property, (which they should not be so construed), the damages are excluded under the

23

Policies' "business risk" exclusions, and are not covered.   The allegations of reduced Property value and loss of use are excluded by the "impaired property" exclusion. To the extent a "personal and advertising injury" is construed as being alleged under Coverage B, any such damages arising from failure of the services to conform with the represented quality, are excluded.   Damages from the false representations in HDI's well/yield report to the State Engineer, are also excluded.   The Homeowners' purely economic losses are not covered.

41.   A stay of this action is not required while the Underlying Action is ongoing, as the duty to defend is determined under the four-corners rule (a/k/a the "Complaint Rule")..

### EMC'S FIRST CLAIM FOR RELIEF – DECLARATORY JUDGMENT

42.   EMC hereby incorporates by reference the allegations contained above in paragraphs 1 through 41 as though fully set forth herein.

43.   The Colorado Supreme Court has set forth the standards governing an insurer's duty to defend and indemnify an insured in several cases, including *Compass Ins. Co. v. City of Littleton,* 984 P.3d 606, 613-14 (Colo. 1999), *Cyprus Amax Minerals Co. v. Lexington Ins. Co.,* 74 P.3d 294, 299 (Colo. 2003), and *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 827-28 (Colo. 2004), as modified on denial of reh'g (June 7, 2004).

44.   Under the "Complaint Rule," an insurer's "duty to defend is determined by looking at the allegations of the underlying complaint against the insured." *Compass Ins. Co. v. City of Littleton,* 984 P.2d at 615.   Under this rule, "a duty to defend exists when a

24

complaint includes any allegations that, 'if sustained, would impose a liability covered by the policy.' *Id."* *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.,* 90 P.3d at 827.

45.   It is, "the **facts** alleged in the underling complaint, not the legal claims asserted by the plaintiff, [that] determine the insurer's duty to defend." *Zurich Am. Ins. Co. v. O'Hara Regional Center for Rehab.,* 529 F.3d 916, 921 (10th Cir. 2008)(applying Colorado law)[Bold Emphasis added].

46.   All of the Policies' terms and exclusions set forth above support that a lack of coverage exists under the Policies for the allegations asserted in the Complaint, and EMC seeks a declaration that no coverage exists for the facts asserted in the Underlying Action, and that no duty exists for EMC to defend and indemnify HDI and Mr. Hersh in the Underlying Action.   The reasons for such noncoverage include, but are not exclusively limited to, the following.

47.   Coverage under a commercial general liability policy is not intended to extend to ordinary business risks such as those relating to repair or replacement of faulty work. *United Fire & Cas. Co. v. Boulder Plaza Residential, LLC,* 633 F.3d 951, 959 (10th Cir. 2011).   An obligation to repair defective work is neither unexpected nor unforeseen and is an economic loss that does not trigger a duty to defend. See, Greystone, 661 F.3d 1272, 1286 (10th Cir. 2011).

48.   The Homeowners' allegations in the Complaint do not assert "property damage" or "bodily injury" that were caused by an "occurrence".   There was no accident alleged, no unforeseen damage to other property, and all of the damages were the expected results from a breach of contractual performance or breach of representation.

49.     The Homeowners' allegations in the Complaint assert damages that were expected from the standpoint of HDI or Mr. Hersh based upon their misrepresentations, which are excluded under Coverage A and Coverage B.

50.     The Homeowners' factual allegations in the Complaint trigger the Policies' application of its "business risk" (a/k/a the "faulty workmanship" exclusions), including the "impaired property" and damage to property not physically injured, exclusion.

51.     To the extent a "personal and advertising injury" was alleged, they are excluded under Coverage A, and under Coverage B they are excluded as the damages are from a failure of the goods or services to conform to the qualities represented.

52.     The allegations of damage in the form of not closing on their Property's purchase and home construction had they known the true facts, such damages are economic losses that are not physical damage to the Property, and are not covered.

53.     Any damages in the form of diminution in value are excluded and would otherwise not be attributable to coverage damage.

54.     Any damages arising from HDI and/or Mr. Hersh's preparation of a report to the State Engineer, are excluded in the Policies' endorsement for damages related to rendering a report or other professional services, and are otherwise excluded by the intentional acts exclusions under Coverages A and B.

55.     To the extent the condition of the water meets the definition of pollutant, and/or the failure to separate the two aquifers is a pollution incident, the damages are excluded.

26

56. Any damages in the form of mental anguish were not due to bodily injury and are not covered.

57. Because no insurance coverage exists for HDI and Mr. Hersh under the Policies, EMC does not have, and never has had, a duty to defend or indemnify HDI and Mr. Hersh in the Underlying Action.

58. Thus, Plaintiff is entitled to receive a judicial declaration in this Court that no coverage exists under the Policies and accordingly that it owes no duty to defend or indemnify HDI and Mr. Hersh.

## SECOND CLAIM FOR RELIEF – UNJUST ENRICHMENT -- RECOUPMENT

59. EMC hereby incorporates by reference the allegations contained above in paragraphs 1 through 58 as though fully set forth herein.

60. In incurring defense costs and attorney fees to defend HDI and Mr. Hersh in the Underlying Action, EMC has provided them with a financial benefit to which they are not legally entitled pursuant to the terms of the Policies. As a result, HDI and Mr. Hersh have been unjustly enriched.

61. Therefore, EMC is entitled to reimbursement and recoupment from HDI and Mr. Hersh, jointly and severally, for the reasonable defense costs and attorney fees paid by EMC that were incurred in defending them in the Underlying Action.

WHEREFORE, EMC respectfully request that this Court enter judgment in its favor and against all Defendants: (1) declaring that no coverage exists under the Policies issued by EMC with respect to claims in the Underlying Action, and, therefore no duty to defend or indemnify HDI and Mr. Hersh exists under the Policies; (2) awarding EMC

27

recoupment of the defense costs EMC has incurred in defending HDI and Mr. Hersh in the Underlying Action, including prejudgment interest; (3) awarding EMC its actual and reasonable costs and attorney fees incurred herein, including interest, as allowed by law; and (4) granting EMC such other and further relief as the Court deems just and proper under the circumstances, at law or in equity.

**EMC REQUESTS A TRIAL TO A JURY ON ALL ISSUES REQUIRING FACTFINDING.**

Respectfully submitted this 5th day of August 2026.

**GIOMETTI & MERENESS, P.C.**

*Original Signatures on File*

s/John D. Mereness

John D. Mereness, #33596
Taylor R. Seibel, #48298
501 So. Cherry Street, Suite 1000
Denver, CO 80246
Ph: (303) 333-1957
Fax: (303) 377-3460
E-mail:
jmereness@giomettilaw.com
tseibel@giomettilaw.com

*Attorneys for Plaintiff*

28